UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

GARNETT MORGAN; WILLIAM SMAW; and JOHNATHAN TUCKER, individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

WARNER BROS. PICTURES, A DIVISION OF WB STUDIO ENTERPRISES INC.; VILLAGE ROADSHOW PRODUCTIONS INC.; WEED ROAD PICTURES; FOUR SEASONS PARTNERSHIP; GK FILMS, LLC; MALPASO PRODUCTIONS, LTD.; RATPAC ENTERTAINMENT, LLC; RATPAC-DUNE ENTERTAINMENT LLC; 21 LAPS ENTERTAINMENT; SPRING CREEK PRODUCTIONS, INC.; and JOHN DOES 1-10,

Defendants.

------------------------------------------------------------------------ X

**COLLECTIVE AND CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, GARNETT MORGAN, WILLIAM SMAW and JOHNATHAN TUCKER, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their attorneys, VALLI KANE & VAGNINI LLP, bring this action for damages and other legal and equitable relief from the Defendants, WARNER BROS. PICTURES, A DIVISION OF WB STUDIO ENTERPRISES INC.; VILLAGE ROADSHOW PRODUCTIONS INC.; WEED ROAD PICTURES; A&E TELEVISION NETWORKS, LLC; BAZMARK PICTURES III (NY) INC.; RED WAGON ENTERTAINMENT, INC.; SPECTRUM FILMS; FOUR SEASONS PARTNERSHIP; GK FILMS, LLC; MALPASO PRODUCTIONS, LTD.; RATPAC ENTERTAINMENT, LLC; RATPAC-DUNE ENTERTAINMENT LLC; 21 LAPS

ENTERTAINMENT; SPRING CREEK PRODUCTIONS, INC. and JOHN DOES 1-10 ("Defendants") and allege as follows:

## INTRODUCTION

1. This is a collective and class action brought under the United States Fair Labor Standards Act, as amended, 29 U.S.C. §§201 *et seq.*, New York Labor Law §§650 *et seq.* (the New York Minimum Wage Act) and New York Labor Law §§195 *et seq.* (the New York Wage Theft Prevention Act) against Defendants for their failure to pay minimum wages and overtime to Parking Production Assistants ("PPAs") hired by Defendants to secure sets, lots, and streets throughout the New York metropolitan area (the "Production Sites"), in connection with Defendants' production of motion pictures, films and movies ("Movies").

2. PPAs are required to keep the Production Sites clear of pedestrians and motorists by either placing cones or by parking company vehicles in order to block both foot and vehicle traffic. PPAs are also responsible for safeguarding production vehicles and equipment while they are on set.

3. Plaintiffs, along with similarly situated current and former employees of Defendants, are non-exempt employees who are paid a shift rate of pay and who do not receive minimum wage or proper overtime compensation for hours worked beyond forty (40) per workweek.

4. Defendants' regular failure to pay Plaintiffs for all hours worked over forty (40) in a workweek violates the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), New York Labor Law §§650 *et seq.* (the "Minimum Wage Act"), the New York Wage Theft Prevention Act § 195 ("WTPA") (together, the "NYLL"), and any other cause(s) of action that can be inferred from the facts set forth herein.

5. Defendants violate these laws by engaging in a systematic scheme of altering Plaintiffs' paychecks in order to deprive them of their statutorily required overtime pay.

6. Plaintiffs allege, on behalf of themselves and similarly situated current and former employees who elect to opt into this action pursuant to the FLSA, that they are entitled to recover: (i) unpaid and incorrectly paid wages for hours worked above forty (40) in a workweek, as required by law; (ii) unpaid overtime; (iii) liquidated damages; (iv) attorneys' fees and costs pursuant to the FLSA; and (v) further relief as this Court finds necessary and proper.

7. Plaintiffs also bring this action, pursuant to the Fed. R. Civ. P. 23, on behalf of a class of all persons who are and were employed by Defendants in the New York metropolitan area as PPAs (including comparable positions under any other nomenclature) during the past six (6) years through the final date of the disposition of this action who: (i) were not paid minimum wage for all hours worked or who were not properly paid overtime wages for hours worked above forty (40) in a workweek, as required by the NYLL; <u>or</u>, (ii) who were subjected to Defendants' willful failure to comply with the notice and record keeping requirements of NYLL§195(1) and 195(3) resulting in penalties under NYLL § 198(1-b) and 198(1-d); and who are entitled to recover: (1) back pay; (2) unpaid overtime; (3) liquidated damages; (4) statutory damages for notice and recordkeeping violations; (5) attorney's fees and costs; (6) interest; and (7) such other further relief as this Court finds just and proper.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, 28 U.S.C. § 1337, which confers original jurisdiction upon this Court for actions arising under any Act of Congress regulating commerce, 28 U.S.C. § 2201, which confers original

jurisdiction upon the filing of an appropriate pleading seeking to declare the rights and other legal relations of any interested party seeking such declaration, and 28 U.S.C. § 2202, conferring original jurisdiction concerning further necessary or proper relief based upon a declaratory judgment.

9. The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 29 U.S.C. §§ 201-219, in as much as this judicial district lies in a State and District in which the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain offices, conduct business and reside in this district.

**PARTIES**

11. Plaintiff Morgan ("Morgan") is a citizen of New York and resides in Bronx, New York.

12. Plaintiff Smaw ("Smaw") is a citizen of New York and resides in Brooklyn, New York.

13. Plaintiff Tucker ("Tucker") is a citizen of New York and resides in Staten Island, New York.

14. Upon information and belief, Defendant Warner Bros. Pictures, a Division of WB Studio Enterprises Inc. ("Warner Bros.") is located at 4000 Warner Blvd, Burbank, California and transacted business in New York by employing Plaintiffs and all those similarly situated in the New York metropolitan area during the production of various motion pictures, films and movies,

including, but not limited to: *"Winter's Tale," "This is Where I Leave You," "Jersey Boys," "A Very Harold & Kumar 3D Christmas," "Bullet to the Head," " Extremely Loud & Incredibly Close," "42," "Tammy"* and *"Focus"* ("Warner Bros. Movie Productions").

15. Upon information and belief, the amount of qualifying annual volume of business for Defendant Warner Bros. exceeds $500,000.00, and thus subjects Defendant Warner Bros. to the FLSA's overtime requirements. Additionally, Defendant Warner Bros. is engaged in interstate commerce. This independently subjects Defendant Warner Bros. to the overtime requirements of the FLSA.

16. Upon information and belief, Defendant Village Roadshow ("Village Roadshow") is located at 10100 Santa Monica Blvd, Ste 200, Los Angeles, California 90067 and transacted business in New York by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Winter's Tale,"* and *"Annie."*

17. Upon information and belief, the amount of qualifying annual volume of business for Defendant Village Roadshow exceeds $500,000.00, and thus subjects Defendant Village Roadshow to the FLSA's overtime requirements. Additionally, Defendant Village Roadshow is engaged in interstate commerce. This independently subjects Defendant Village Roadshow to the overtime requirements of the FLSA.

18. Upon information and belief, Defendant Weed Road Pictures ("Weed Road") is located at 4000 Warner Blvd, Bldg 81, Suite 115, Burbank, California and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Winter's Tale*."

19. Upon information and belief, the amount of qualifying annual volume of business for Defendant Weed Road exceeds $500,000.00, and thus subjects Defendant Weed Road to the FLSA's overtime requirements. Additionally, Defendant Weed Road is engaged in interstate commerce. This independently subjects Defendant Weed Road to the overtime requirements of the FLSA.

20. Upon information and belief, Defendant Four Seasons Partnership ("Four Seasons") is located at 8942 Wilshire Blvd, Beverly Hills, California 90211 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Jersey Boys.*"

21. Upon information and belief, the amount of qualifying annual volume of business for Defendant Four Seasons exceeds $500,000.00, and thus subjects Defendant Four Seasons to the FLSA's overtime requirements. Additionally, Defendant Four Seasons is engaged in interstate commerce. This independently subjects Defendant Four Seasons to the overtime requirements of the FLSA.

22. Upon information and belief, Defendant GK Films, LLC ("GK") is located at 1221 2nd Street, Ste. 200, Santa Monica, California 90401 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Jersey Boys*."

23. Upon information and belief, the amount of qualifying annual volume of business for Defendant GK exceeds $500,000.00, and thus subjects Defendant GK to the FLSA's overtime

requirements. Additionally, Defendant GK is engaged in interstate commerce. This independently subjects Defendant GK to the overtime requirements of the FLSA.

24. Upon information and belief, Defendant Malpaso Productions, LTD. ("Malpaso") is located at 132 South Rodeo Drive, Beverly Hills, California 90212 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Jersey Boys*" and "*Sully*."

25. Upon information and belief, the amount of qualifying annual volume of business for Defendant Malpaso exceeds $500,000.00, and thus subjects Defendant Malpaso to the FLSA's overtime requirements. Additionally, Defendant Malpaso is engaged in interstate commerce. This independently subjects Defendant Malpaso to the overtime requirements of the FLSA.

26. Upon information and belief, Defendant RatPac Entertainment, LLC ("RatPac") is located at 16030 Ventura Blvd, Ste. 380, Los Angeles, California 91436 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Jersey Boys*" and "*Sully*."

27. Upon information and belief, the amount of qualifying annual volume of business for Defendant RatPac exceeds $500,000.00, and thus subjects Defendant RatPac to the FLSA's overtime requirements. Additionally, Defendant RatPac is engaged in interstate commerce. This independently subjects Defendant RatPac to the overtime requirements of the FLSA.

28. Upon information and belief, Defendant RatPac-Dune Entertainment LLC ("RatPac-Dune") is located at 4000 Warner Boulevard, Bldg. 95, Burbank, California 91522 and transacted business in New York State by employing Plaintiffs and all those similarly situated in

the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*Jersey Boys*," "*Focus*" and "*Run All Night*."

29. Upon information and belief, the amount of qualifying annual volume of business for Defendant RatPac-Dune exceeds $500,000.00, and thus subjects Defendant RatPac-Dune to the FLSA's overtime requirements. Additionally, Defendant RatPac-Dune is engaged in interstate commerce. This independently subjects Defendant RatPac-Dune to the overtime requirements of the FLSA.

30. Upon information and belief, Defendant 21 Laps Entertainment ("21 Laps") is located at 16255 Ventura Blvd, Encino, California 91436 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*This is Where I Leave You*."

31. Upon information and belief, the amount of qualifying annual volume of business for Defendant 21 Laps exceeds $500,000.00, and thus subjects Defendant 21 Laps to the FLSA's overtime requirements. Additionally, Defendant 21 Laps is engaged in interstate commerce. This independently subjects Defendant 21 Laps to the overtime requirements of the FLSA.

32. Upon information and belief, Defendant Spring Creek Productions, Inc. ("Spring Creek") is located at 10100 Santa Monica Blvd, Ste. 1700, Los Angeles, California 90067 and transacted business in New York State by employing Plaintiffs and all those similarly situated in the New York metropolitan area during production of various motion pictures, films and movies, including, but not limited to: "*This is Where I Leave You*."

33. Upon information and belief, the amount of qualifying annual volume of business for Defendant Spring Creek exceeds $500,000.00, and thus subjects Defendant Spring Creek to

the FLSA's overtime requirements. Additionally, Defendant Spring Creek is engaged in interstate commerce. This independently subjects Defendant Spring Creek to the overtime requirements of the FLSA.

34. John Does 1-10 represent the currently unknown parent, subsidiary, or affiliate entities and/or individuals who jointly employed Plaintiffs along with Defendant Warner Bros. for the production, scheduling, hiring, termination, terms & conditions of employment, compensation and/or overall pay practices on the Production Sites of movies filmed in the New York metropolitan area during the relevant time periods.

35. At all relevant times, Defendant Warner Bros. along with each of the other Defendants jointly employed Plaintiffs and together formed a "single integrated enterprise."

## FLSA COLLECTIVE ACTION ALLEGATIONS

36. Plaintiffs bring the first claim for relief pursuant to 29 U.S.C. § 216(b) on behalf of themselves and all similarly situated persons who elect to opt into this action and presently work for, or in the past have worked for, any or all of the Defendants, in the following collective:

> All PPAs (or other employees performing substantially the same job duties and responsibilities under other nomenclature), employed in the New York metropolitan area, who worked in excess of forty (40) hours in a given workweek during the FLSA statutory period ("FLSA Class" or "FLSA Plaintiffs") on the production of a film, motion picture or movie produced by Defendants or their affiliated entities.

37. At all relevant times, Plaintiffs are and have been similarly situated to all FLSA Class members because while employed by Defendants they performed similar tasks, were subject to the same laws and regulations, were paid in the same or similar manner, were paid the same or similar rates, were required to work in excess of forty (40) hours per work-week, and were not

paid the required one and a half (1 ½) times their respective regular rates of pay for time worked beyond forty (40) hours per week.

38. Upon information and belief, Defendants treated all FLSA Class members similarly in requiring them to work in excess of forty (40) hours per workweek without adequate overtime compensation. Plaintiffs and FLSA Class members currently work (or worked) for Defendants at various Production Sites throughout the New York metropolitan area four (4) to six (6) days per week for an average of sixty (60) to one-hundred (100) hours per week, or more. They were regularly and specifically scheduled to work more than forty (40) hours per workweek, yet Defendants did not pay them the statutorily required overtime compensation. This practice was applied to all PPAs who worked on a motion picture, film or movie produced by one or more of the Defendants against all employees in a similar or identical fashion.

39. Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate the FLSA Plaintiffs, and as such, notice should be sent to the FLSA Class members pursuant to 29 U.S.C. § 216(b). There are numerous similarly situated current and former employees of Defendants who were subject to the conduct complained of herein and who would benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity to join the action. Those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

40. Defendants' conduct, as set forth in this complaint, was willful and in bad faith, and has caused significant damages to Plaintiffs and the FLSA Class. As exemplified by their doctored payroll records, Defendants are and have been aware of the requirement to pay Plaintiffs an overtime rate for their hours in excess of forty (40) per workweek. However, Defendants have purposefully elected to force Plaintiffs to work off-the-clock hours by unilaterally reducing their

reported hours of work each workweek and thus have knowingly and willfully failed to pay overtime.

## RULE 23 CLASS ALLEGATIONS

41. Plaintiffs additionally seek to maintain this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of those who, during the previous six (6) years, were subjected to violations of the NYLL.

42. The Class which Plaintiffs seek to define includes:

> All PPAs (or other employees performing substantially the same job duties and responsibilities under other nomenclature), employed in the New York metropolitan area, who worked in excess of forty (40) hours in a given workweek during the NYLL Labor Law statutory period (the "New York Class") on the production of a film, motion picture or movie produced by Defendants or their affiliated entities.

43. The persons in the New York Class identified above are so numerous that joinder of all members is impracticable. Although Plaintiffs do not know the precise number of such persons, the facts upon which to base the calculation of that number are readily ascertainable since the identity, addresses, time records, work schedules, positions and rates of pay for each Class Member are determinable from Defendants' records. Notice can be provided pursuant to FRCP 23.

44. Upon information and belief, during the previous six (6) years, Defendants have, in total, employed well in excess of 500 PPAs in order to staff their Production Sites throughout the State of New York.

45. There are questions of law and/or fact common to the New York Class that predominate over any questions solely affecting individual members of the New York Class, including but not limited to the following:

a. whether members of the New York Class were scheduled to work and/or required to work shifts of approximately twelve (12) hours, spanning four (4) to six (6) consecutive days per week;

b. Whether members of the New York Class were paid at least the minimum wage for the hours worked in excess of forty (40) hours per week

c. whether members of the New York Class were properly compensated for overtime pay pursuant to Defendants' policies;

d. whether Defendants failed to properly pay members of the New York Class for the hours worked in excess of forty (40) hours per week;

e. whether Defendants had a uniform policy and practice of paying a flat shift-rate of pay, including for overtime hours Defendants acknowledged Plaintiffs and members of the New York Class worked;

f. whether Defendants required members of the New York Class to work "off-the-clock" prior to and/or after their shifts;

g. whether Defendants reduced members of the New York Class's actual hours worked each pay period in an effort to circumvent overtime pay requirements and whether such circumvention was willful;

h. whether Defendants kept accurate records of hours worked by members of the New York Class; and,

i. whether Defendants have any affirmative defenses for any of these claims.

46. The claims of Plaintiffs are typical of the claims of the members of the New York Class sought to be represented. Plaintiffs and the other New York Class members are or were employed by one or more of the Defendants and their affiliated entities and have been subjected

to their policies, patterns or practices of failing to pay minimum wage, overtime or proper overtime wages for hours worked in excess of forty (40) hours per week.

47. Defendants employed Plaintiffs in the same capacity as all members of the New York Class. All members of the New York Class were treated the same or similarly with respect to pay or lack thereof. Thus, there are common questions of law and fact which are applicable to each and every one of the members of the New York Class.

48. This treatment included, but was not limited to, failure to pay employees the proper minimum and overtime wages.

49. Plaintiffs will fairly and adequately represent and protect the interests of the members of the New York Class.

50. Plaintiffs have kept records from their time working for Defendants and their affiliated entities and would properly and adequately represent the current and former employees who have been subjected to the treatment alleged herein. Additionally, Plaintiffs' attorneys have substantial experience in this field of law.

51. A class action is superior to other available methods for the fair and efficient adjudication of the NYLL claims, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a company. Class treatment of the New York Class claims is superior because it will obviate the need for duplicative litigation that may result in inconsistent judgments about Defendants' practices. There are no facts pertaining to Plaintiffs that are atypical from those of the New York Class. Indeed, upon information and belief, Plaintiffs were treated identically to other members of the New York Class.

## STATEMENT OF THE FACTS

*Facts Common to all Plaintiffs and Defendants*

52. Defendants produce various motion pictures, films and movies on video and in digital form ("Productions").

53. In connection with the Productions, Defendants hire PPAs to work on various Production Sites in the New York metropolitan area.

54. Generally, each Production Site operates pursuant to permit(s) granted by the New York City Office of Film, Theatre and Broadcasting ("OFTB Permits"). OFTB Permits provide access to public locations and street parking for essential production vehicles throughout the 300 square miles of public settings in New York City's five boroughs, including 27,000 acres of city parks. OFTB Permits also permit special parking privileges at locations for vehicles essential to the shoot including equipment trucks, lifts, cranes, campers and satellite trucks.

55. The street parking privileges granted by the OFTB Permits allow production vehicles to, *inter alia*: park production vehicles within five (5) blocks of the permitted locations in areas designated with "No Standing except Trucks Loading & Unloading and Commercial Vehicles" signs; to park at metered parking spaces without making payments to the meters; (3) to park in areas designated with "No Parking – Alternate Sides" signs; (4) to park in areas designated with "No Parking 8am-6pm" signs, and (5) park in other designated areas specified in the OFTB Permits.

56. The PPAs secure the Production Sites during the course of the Productions. In order for the PPAs to properly secure the Production Sites, they are required to work round-the-clock surveillance without any breaks.

57. As PPAs, Plaintiffs are required to work during all hours in which Defendants or their property are present on the Production Sites, including during inclement weather and when a set is shut down for any reason.

58. Plaintiffs are unable to leave the Production Sites for food and are not provided compensation for either lunch or dinner, although dinner is provided for other employees of the Defendants.

59. Plaintiffs are given limited access to the restrooms on the Production Sites. Plaintiffs are only provided restroom privileges when and if the Productions are in the midst of filming. Otherwise, Plaintiffs are forced to go to the bathroom in their cars or pay local businesses in order to use their restroom facilities. Due to limitations on their ability to leave their assigned locations, many of the Plaintiffs are forced to urinate and defecate into bottles and buckets in their vehicles.

60. Moreover, Plaintiffs are forced to work in extreme weather and at times are not allowed to use externally powered heaters or are forced to run their vehicles 24 hours per day in order to have heat or air conditioning.

61. Generally, at each Production Site, the Location Manager, a Parking Coordinator and an accountant for Defendants determine a flat rate of pay per shift that is applicable to all of the PPAs utilized at that Production Site.

62. The Defendants have been responsible for scheduling the Plaintiffs for work and determining the number of shifts each Plaintiff worked in a given week.

63. Defendants paid Plaintiffs and those similarly situated with a flat shift-rate of pay ranging from $140.00 to $160.00 for each twelve (12) hour shift. This rate of pay varied based on

the production on which Plaintiffs were working. The most common shift rate was $150.00 per shift. However, Plaintiffs were frequently assigned shifts of fewer than twelve (12) hours.

64. Plaintiffs' paychecks did not reflect their actual rates of pay. Instead, when working a twelve (12) hour shift, their paychecks would indicate that they worked eight (8) hours at one fictional rate and an additional four (4) hours at another fictional rate. These fictional rates were "backed into" by Defendants' accountants (down to the fourth decimal place) so that the hours reported on Plaintiffs' paychecks came out to exactly equal to the shift rates described above.

65. Plaintiffs were required by Defendants to work at least four (4) hours in order to be paid for a six (6) hour "half-shift" rate of pay. Similarly, Plaintiffs were required to work at least eight (8) hours in order to be paid for a twelve (12) hour "full shift" rate of pay. If Plaintiffs failed to meet the abovementioned thresholds, they were not compensated by Defendants for hours worked below these threshold levels.

66. For example, if Plaintiffs worked less than four (4) hours they would not be compensated at all. If Plaintiffs worked between six (6) and eight (8) hours, they would only be compensated for six (6) hours. Similarly, if Plaintiffs worked fifteen (15) hours they would only be compensated for twelve (12) hours.

67. Plaintiffs never had any influence or say over their rate of pay per shift.

68. Defendants provide a payroll company with all the necessary hiring and employment records for the PPAs including, but not limited to: W2 employment forms, W4 Employment Forms, Pay Rate Acknowledgment Forms, Wage Verification Forms (purporting to provide the information required under the New York WTPA), Conflict of Interest Questionnaires, Direct Deposit Forms and Employment Verification Forms.

69. During the execution of these documents, Defendants required Plaintiffs to leave the wage information blank on the Wage Verification Forms and Defendants later fill in the information required by the New York WTPA with the rates necessary to complete their scheme of depriving Plaintiffs of their minimum wage and overtime pay.

70. One method utilized by Parking Coordinators to schedule PPA's for any given production is to contact the PPA's via cell phone either by text or message to convey their schedule and the Production Site they are to report to.

71. At the end of each pay period the Parking Coordinator for each Production Site compiles data for each PPA's total time worked and submits employee "Time Sheets" to the accountant responsible for each Production Site.

72. The Time Sheets submitted by the Parking Coordinators to the accountants responsible for the Production Sites purport to bear the signatures of the PPAs. However, it is routine practice for the Parking Coordinator to sign the PPA's name instead of obtaining the individual PPA's signature, without obtaining the approval of the PPA.

73. Based upon the Time Sheets purportedly signed by the PPAs, Defendants would then provide the final pay information for each PPA to a payroll company that issued paychecks to the Plaintiffs on a weekly basis.

74. These paychecks did not accurately reflect the agreed upon rates of pay or the number of hours actually worked by each Plaintiff per workweek.

*Defendant Warner Bros.*

75. From February 1, 2010 to the present, Defendant Warner Bros. has produced and distributed motion pictures, films and movies at its behest and in conjunction with the other Defendants or through its own production efforts.

76. Defendant Warner Bros., in conjunction with the other identified and John Doe Defendants, have employed PPAs subjected to the unlawful pay practices described above.

77. During the relevant time period and presently, these films and movies include, but are not limited to: *"Winter's Tale," "This is Where I Leave You," "Jersey Boys," "A Very Harold & Kumar 3D Christmas," "Bullet to the Head," " Extremely Loud & Incredibly Close," "42," "Tammy"* and *"Focus."*

78. All Plaintiffs are similarly situated to the FLSA Class and New York Class members hired in connection with the production of the Warner Bros. Movie Productions.

*Garnett Morgan*

79. Beginning in or around 2013, Plaintiff Morgan worked as a PPA on the film, "*Winter's Tale*," produced by Defendants Warner Bros., Village Roadshow, Weed Road and John Does 1-10.

80. As a PPA, Plaintiff Morgan was responsible for keeping Production Sites clear of pedestrians and motorists and for safeguarding production equipment while on set.

81. As a result of Defendants' failure to provide Plaintiff Morgan with a restroom while on the Production Site(s), he had to frequently urinate and defecate into buckets and cones in his personal vehicle.

82. At the start of the *Winter's Tale* production, Plaintiff Morgan was required by Defendants to fill out and sign blank Wage Verification Forms or else forego the opportunity to work on the production. Defendants would later on fill in the respective forms with information concerning Morgan's purported wages and hours worked.

83. At the end of each pay period, Plaintiff Morgan's Parking Coordinator would fill out Morgan's Time Sheet and sign his name for submission to the Defendants' accountant(s)

without Plaintiff Morgan's approval. Plaintiff Morgan never had any say with respect to the hours submitted.

84. Plaintiff Morgan was typically paid $150 per twelve (12) hour shift and worked on average between sixty (60) and one-hundred (100) hours a week, consisting of approximately five (5) to nine (9) shifts. However, Plaintiff Morgan was also assigned shifts of fewer than twelve (12) hours.

85. Plaintiff Morgan was required by Defendants to work at least four (4) hours in order to be paid for a six (6) hour "half-shift" rate of pay. Similarly, Plaintiff Morgan was required to work at least eight (8) hours in order to be paid for a twelve (12) hour "full shift" rate of pay. If Plaintiff Morgan failed to meet the abovementioned thresholds, he was not compensated by Defendants for hours worked below these threshold levels.

86. Plaintiff Morgan was paid weekly by check.

87. Plaintiff Morgan's paychecks did not reflect his actual rate of pay. Instead, when Plaintiff Morgan worked a twelve (12) hour shift, his paycheck would report that he worked eight (8) hours at one fictional rate and an additional four (4) hours at another fictional rate, where these fictional rates were "backed into" by Defendants' accountants (down to the fourth decimal place) so that the hours reported on Plaintiff Morgan's paychecks came out to exactly equal the $150 shift rate described above supporting the fact that he and other similarly situated PPAs were in fact paid a shift rate.

88. Plaintiff Morgan was not compensated for all hours worked and as a result was denied the mandated minimum wage rate for certain hours worked.

89. Plaintiff Morgan was also required to work in excess of forty (40) hours per week without receiving proper overtime compensation.

90. Defendants' methodology of "backing out" the hours worked on Plaintiff Morgan's paycheck was done in order to meet pre-fixed weekly figures based wholly off of the number of shifts he worked per pay period.

91. As a result, Plaintiff Morgan's paycheck did not reflect the actual hours worked and he was effectively made to work "off the clock."

*William Smaw*

92. Beginning in or around 2013, Plaintiff Smaw worked as a PPA on the film, "*Jersey Boys*," produced by Defendants Warner Bros., Four Seasons, GK, Malpaso, RatPac, RatPac-Dune and John Does 1-10.

93. As a PPA, Plaintiff Smaw was responsible for keeping Production Sites clear of pedestrians and motorists and for safeguarding production equipment while on set.

94. As a result of Defendants' failure to provide Plaintiff Smaw with a restroom while on the Production Site(s), he had to frequently urinate and defecate into buckets and cones in his personal vehicle.

95. At the start of the *Jersey Boys* production, Plaintiff Smaw was required by Defendants to fill out and sign blank Wage Verification Forms or else forego the opportunity to work on the production. Defendants would later on fill in the respective forms with information concerning Smaw's purported wages and hours worked.

96. At the end of each pay period, Plaintiff Smaw's Parking Coordinator would fill out Smaw's Time Sheet and sign his name for submission to the Defendants' accountant(s) without Plaintiff Smaw's approval. Plaintiff Smaw never had any say with respect to the hours submitted.

97. Plaintiff Smaw was typically paid $150 per twelve (12) hour shift and worked on average between sixty (60) and one-hundred (100) hours a week, consisting of approximately five

(5) to nine (9) shifts. However, Plaintiff Smaw was also assigned shifts of fewer than twelve (12) hours.

98. Plaintiff Smaw was required by Defendants to work at least four (4) hours in order to be paid for a six (6) hour "half-shift" rate of pay. Similarly, Plaintiff Smaw was required to work at least eight (8) hours in order to be paid for a twelve (12) hour "full shift" rate of pay. If Plaintiff Smaw failed to meet the abovementioned thresholds, he was not compensated by Defendants for hours worked below these threshold levels.

99. Plaintiff Smaw was paid weekly by check.

100. Plaintiff Smaw's paychecks did not reflect his actual rate of pay. Instead, when Plaintiff Smaw worked a twelve (12) hour shift, his paycheck would report that he worked eight (8) hours at one fictional rate and an additional four (4) hours at another fictional rate, where these fictional rates were "backed into" by Defendants' accountants (down to the fourth decimal place) so that the hours reported on Plaintiff Smaw's paychecks came out to exactly equal the $150 shift rate described above supporting the fact that he and other similarly situated PPAs were in fact paid a shift rate.

101. Plaintiff Smaw was not compensated for all hours worked and as a result was denied the mandated minimum wage rate for certain hours worked.

102. Plaintiff Smaw was also required to work in excess of forty (40) hours per week without receiving proper overtime compensation.

103. Defendants' methodology of "backing out" the hours worked on Plaintiff Smaw's paycheck was done in order to meet pre-fixed weekly figures based wholly off of the number of shifts he worked per pay period.

104. As a result, Plaintiff Smaw's paycheck did not reflect the actual hours worked and he was effectively made to work "off the clock."

*Jonathan Tucker*

105. Beginning in or around 2013, Plaintiff Tucker worked as a PPA on the film, "*This is Where I Leave You*," produced by Defendants Warner Bros., 21 Laps, Spring Creek and John Does 1-10.

106. As a PPA, Plaintiff Tucker was responsible for keeping Production Sites clear of pedestrians and motorists and for safeguarding production equipment while on set.

107. As a result of Defendants' failure to provide Plaintiff Tucker with a restroom while on the Production Site(s), he had to frequently urinate and defecate into buckets and cones in his personal vehicle.

108. At the start of the *This is Where I Leave You* production, Plaintiff Tucker was required by Defendants to fill out and sign blank Wage Verification Forms or else forego the opportunity to work on the production. Defendants would later on fill in the respective forms with information concerning Tucker's purported wages and hours worked.

109. At the end of each pay period, Plaintiff Tucker's Parking Coordinator would fill out Tucker's Time Sheet and sign his name for submission to the Defendants' accountant(s) without obtaining Plaintiff Tucker's approval. Plaintiff Tucker never had any say with respect to the hours submitted.

110. Plaintiff Tucker was typically paid $150 per twelve (12) hour shift and worked on average between sixty (60) and one-hundred (100) hours a week, consisting of approximately five (5) to nine (9) shifts. However, Plaintiff Tucker was also assigned shifts of fewer than twelve (12) hours.

111. Plaintiff Tucker was required by Defendants to work at least four (4) hours in order to be paid for a six (6) hour "half-shift" rate of pay. Similarly, Plaintiff Tucker was required to work at least eight (8) hours in order to be paid for a twelve (12) hour "full shift" rate of pay. If Plaintiff Tucker failed to meet the abovementioned thresholds, he was not compensated by Defendants for hours worked below these threshold levels.

112. Plaintiff Tucker was paid weekly by check.

113. Plaintiff Tucker's paychecks did not reflect his actual rate of pay. Instead, when Plaintiff Tucker worked a twelve (12) hour shift, his paycheck would report that he worked eight (8) hours at one fictional rate and an additional four (4) hours at another fictional rate, where these fictional rates were "backed into" by Defendants' accountants (down to the fourth decimal place) so that the hours reported on Plaintiff Tucker's paychecks came out to exactly equal the $150 shift rate described above supporting the fact that he and other similarly situated PPAs were in fact paid a shift rate.

114. Plaintiff Tucker was not compensated for all hours worked and as a result was denied the mandated minimum wage rate for certain hours worked.

115. Plaintiff Tucker was also required to work in excess of forty (40) hours per week without receiving proper overtime compensation.

116. Defendants' methodology of "backing out" the hours worked on Plaintiff Tucker's paycheck was done in order to meet pre-fixed weekly figures based wholly off of the number of shifts he worked per pay period.

117. As a result, Plaintiff Tucker's paycheck did not reflect the actual hours worked and he was effectively made to work "off the clock."

*The Violations*

118. Although Defendants informed Plaintiffs that they were to be paid on a flat shift-rate basis, Defendants never correctly compensated Plaintiffs by paying their statutorily required overtime pay. Rather, ***Defendants unilaterally reduced the number of reported hours worked by Plaintiffs and calculated a fictitious, hourly overtime rate which ultimately resulted in Plaintiffs receiving only the flat shift rate.***

119. As such, the reported hours worked on each of the paychecks were consistently less than what Plaintiffs actually worked during that pay period.

120. Upon information and belief, Defendants have obtained the assistance of accountants and/or employees to calculate the precise number of purported regular, overtime and double time hours reported on Plaintiffs' checks so that Plaintiffs' stated weekly gross earnings correspond to pre-determined totals budgeted and accounted for by Defendants.

121. Defendants' methodology of "backing out" the hours to meet pre-determined weekly figures is unlawful, as it directly resulted in the Plaintiffs being improperly paid for their total hours worked.

122. In order to hide the fact that Plaintiffs have been paid less than what is statutorily required, Defendants falsely and incorrectly stated the numbers of hours worked in payroll records and on Plaintiffs' paychecks. Defendants did not take into account the fact that Plaintiffs' shifts were twelve (12) hours in length when computing their hours worked per week. This was all done by Defendants as part of an effort to withhold from Plaintiffs their lawful compensation.

123. In effect, Defendants have been continuously "shaving off" hours that Plaintiffs worked each week, forcing the Plaintiffs to work "off-the-clock."

124. As a result, Plaintiffs have not been paid for their actual total hours worked throughout the workweek.

125. Upon information and belief, Plaintiffs and those similarly situated have been treated uniformly throughout their employment with Defendants at their various Production Sites.

126. At all relevant times, Defendants controlled all terms and conditions of Plaintiffs' employment, including but not limited to their hours and rates of pay.

127. All Defendants have been aware of their payroll practice and were consciously disregarding the requirements of the FLSA and NYLL.

128. All Defendants have been knowingly and willfully paying Plaintiffs and other similarly situated PPAs a shift-rate for hours worked over forty (40) rather than an hourly rate, which deprived them of statutorily mandated overtime.

129. All Defendants have been knowingly and willfully depriving Plaintiffs and other similarly situated PPAs of the statutorily mandated minimum wage as illustrated in Paragraphs 65-66 above.

130. This falsification of payroll records further evidences Defendants' knowing and willful violation of the law.

## CAUSES OF ACTION

## AS AGAINST ALL DEFENDANTS BY ALL PLAINTIFFS

### First Cause of Action
### for Violation of the Fair Labor Standards Act, 29 U.S.C. §§201-219

131. Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

132. Defendants employed the FLSA Plaintiffs, and employed or continue to employ, each member of the FLSA Plaintiffs collective within the meaning of the FLSA.

133. Defendants have engaged in a widespread pattern and practice of violating the FLSA, as detailed in this Complaint.

134. Each of the Plaintiffs consents in writing to be a party to this action, pursuant to 29 U.S.C. §216(b).

135. The overtime wage provisions set forth in 29 U.S.C. §§201, *et seq.*, apply to Defendants.

136. Defendants have a policy and practice of paying a shift rate of pay in lieu of an hourly rate and overtime. The shift pay did not and does not accurately reflect overtime pay due to FLSA Plaintiffs.

137. As a result of Defendants' willful failure to compensate FLSA Plaintiffs at a rate not less than one and one-half (1 ½) times the regular rate of pay for work performed in excess of forty (40) hours in a workweek, Defendants have violated, and continue to violate, the FLSA.

138. As a result of Defendants' willful failure to record, credit and/or compensate FLSA Plaintiffs, Defendants have failed to make, keep, and preserve records with respect to each of their employees sufficient to determine the wages, hours and other conditions and practices of employment, in violation of the FLSA.

139. As a result of Defendants' FLSA violations, FLSA Plaintiffs are entitled to recover from Defendants: (a) overtime compensation; (b) an additional, equal amount as liquidated damages for Defendants' willful violations of the FLSA; and, (c) reasonable attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C. §216(b).

140. Because Defendants' violations of the FLSA lacked good faith, a three-year statute of limitations applies pursuant to 29 U.S.C. §255.

**Second Cause of Action**
**for Violation of the New York Labor Law §§650 et. seq.**

141. Plaintiffs on behalf of themselves and the New York Class, re-allege and incorporate by reference all of the preceding paragraphs as if they were set forth again herein.

142. Defendants employed Plaintiffs, and employed or continue to employ each of the New York Class Plaintiffs, within the meaning of the NYLL.

143. Defendants have engaged in a widespread pattern and practice of violating the minimum and overtime wage provisions of Article 19 of the NYLL and its supporting regulations, as detailed in the Complaint.

144. The minimum and overtime wage provisions of Article 19 of the NYLL and its supporting regulations apply to Defendants.

145. Defendants have failed to pay Plaintiffs and the New York Class Plaintiffs the minimum and overtime wages to which they are entitled under the NYLL.

146. By virtue of Defendants' failure to pay Plaintiffs and the New York Class Plaintiffs overtime wages for all hours worked in excess of forty (40) hours per week, Defendants have willfully violated NYLL Article 19, §§650, *et seq.*, and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. 142-2.1 and 12 N.Y.C.R.R. 142-2.2.

147. As a result of Defendants' willful violations of the NYLL as relates to the Plaintiffs, they and the New York Class Plaintiffs are entitled to recover from Defendants their unpaid minimum and overtime wages, liquidated damages, prejudgment and post-judgment interest, as well as reasonable attorneys' fees and costs of this action.

148. Defendants' violations have caused the Plaintiffs and New York Class Plaintiffs irreparable harm for which there is no adequate remedy at law.

**Third Cause of Action for Violation of the New York Labor Law**

149. Plaintiffs on behalf of themselves and the New York Class, re-allege and incorporate by reference all of the preceding paragraphs as if they were set forth again herein.

150. NYLL §195(3) requires that Defendants furnish each of its employees with a statement with every payment listing gross wages, deductions and net wages, and upon request of an employee, an explanation of the computation of wages.

151. NYLL §195(4) requires, among other things, that Defendants establish and maintain, for at least six (6) years payroll records showing the hours worked, gross wages, deductions and net wages for each employee.

152. NYLL §661 requires that Defendants maintain, *inter alia*, true and accurate records of hours worked by each employee covered by an hourly minimum wage rate, and the wages paid to all employees.

153. 12 N.Y.C.R.R. §142-2.6 requires Defendants to establish, maintain and preserve, for six (6) years, weekly payroll records showing, *inter alia*, each employee's name, wage rate, number of hours worked daily and weekly, amount of gross and net wages, deductions from gross wages, and any allowances claimed as part of the minimum wage.

154. N.Y.C.R.R. §142-2.7 requires Defendants to furnish each employee with a statement with every payment of wages, listing hours worked, rates paid, gross and net wages, deductions, and allowances, if any, claimed as part of the minimum wage.

155. Defendants did not provide Plaintiffs or the New York Class Plaintiffs with accurate or truthful requisite notices and statements described above in the foregoing paragraphs.

156. As a result of Defendants' failure to comply with the notice and record keeping requirements of NYLL §195 (including subsections (3) and (4) thereof), Plaintiffs and New York Class Plaintiffs are entitled to recover from Defendants penalties as provided by NYLL §198(1-b) and 198(1-d).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all FLSA Plaintiffs and New York Class Plaintiffs employed by each Defendant, demand judgment against Defendants as follows:

157. At the earliest possible time, Plaintiffs should be allowed to give notice of this collective action, or the Court should issue such notice, to all FLSA Plaintiffs. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper overtime wages;

158. Designation of Plaintiffs as representatives of the FLSA Plaintiffs collective and New York Class Plaintiffs, and Plaintiffs' counsel as Class Counsel, pursuant to FRCP Rule 23;

159. Equitable tolling of the FLSA statute of limitations as a result of the Defendants' failure to post requisite notices under the FLSA;

160. Certification of this action as a class action pursuant to FRCP Rule 23 for the purposes of the claims brought on behalf of all New York Class Plaintiffs under the New York Labor Law and the New York Department of Labor Regulations;

161. Penalties under NYLL §§198(1-b) and 198(1-d) for Defendants' failure to comply with the notice and record-keeping requirements of NYLL §§195, including subsections (3) and (4) thereof;

162. Demand a jury trial on these issues to determine liability and damages;

163. Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

164. A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, 29 U.S.C. §§201-219, ("FLSA"), the New York Labor Law, §§650 *et. seq*. and the Wage Theft Prevention Act, §195 of the New York Labor Law as amended in April 2011;

165. All damages which Plaintiffs, FLSA Plaintiffs and New York Class Plaintiffs have sustained as a result of Defendants' conduct, including back pay, liquidated damages, front pay, general and special damages for lost compensation and job benefits they would have received but for Defendants' improper practices;

166. An award to Plaintiffs, FLSA Plaintiffs and New York Class Plaintiffs of pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action, on all unpaid wages from the date such wages were earned and due;

167. An award to the Plaintiffs, FLSA Plaintiffs and New York Class Plaintiffs representing Defendants' share of FICA, FUTA, state unemployment insurance and any other required employment taxes;

168. An award to the Plaintiffs, FLSA Plaintiffs, and New York Class Plaintiffs for the amount of unpaid wages, including interest thereon, and penalties subject to proof;

169. Awarding Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

170. Pre-judgment and post-judgment interest, as provided by law; and

171. Granting Plaintiffs, FLSA Plaintiffs, and New York Class Plaintiffs other and further relief as this Court finds necessary and proper.

Dated: February 23, 2016
Garden City, New York

Respectfully Submitted,

VALLI KANE & VAGNINI, LLP
600 Old Country Road, Suite 519
Garden City, New York 11530
516-203-7180

James A. Vagnini (JV-2163)
Robert J. Valli, Jr. (RV-9995)
Matthew L. Berman (MB-0707)